UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-22713-CV-WILLIAMS

MICHAEL LANDA,

    Plaintiff,

v.

AON CORPORATION EXCESS BENEFIT
PLAN, AS AMENDED AND RESTATED AS
OF JANUARY 1, 2009,

    Defendant.
_____/

### ORDER

**THIS MATTER** is before the Court on the Motion for Summary Judgment (DE 36) ("***Motion***") filed by Defendant Aon Corporation Excess Benefit Plan ("***Defendant***") to which Plaintiff Michael Landa ("***Landa***" or "***Plaintiff***") filed a Response (DE 46), and Defendant filed a Reply (DE 53); and the Cross-Motion for Summary Judgment (DE 38) ("***Cross-Motion***") filed by Plaintiff to which Defendant filed a Response (DE 48) and Plaintiff filed a Reply (DE 53).[1]  For the reasons set forth below, Defendant's Motion (DE 36) is **GRANTED** and Plaintiff's Cross-Motion (DE 38) is **DENIED**.

### I.  BACKGROUND

After working over twenty-five (25) years at Aon Risk Services, Inc. ("***Aon***" or "***Company***"), Plaintiff Michael Landa resigned from his position as Executive Vice

---

[1] In accordance with Southern District of Florida Local Rule 56.1, the Parties properly filed separate and contemporaneous Statements of Material Facts.  *See* S.D. Fla. L.R. 56.1(a).  The Court will cite to the Parties' respective statements of material facts throughout this Order.

President and Producer on June 10, 2021. (DE 39 at 1.) At the time, Landa was an eligible participant and member of the Aon Corporation Excess Benefit Plan as Amended and Restated as of January 1, 2009 ("**EBP**" or "**Plan**"). (DE 39 at 1.) Otherwise known as an unfunded Supplemental Executive Retirement Plan, the Plan functions as an unfunded deferred compensation plan offering supplemental retirement benefits for select management or highly compensated employees. (DE 39 at 1.)

Generally, Aon operates as an international professional services business that provides insurance brokerage services. (DE 36 at 1.) While Landa worked at the Company, he primarily identified, developed, and maintained relationships with current and potential clients for revenue-generating opportunities on Aon's behalf. (DE 37 at 1.) Landa asserts that he resigned due to Aon's failure to comply with assurances made to him related to several projects he facilitated in addition to certain uncertainties stemming from a possible merger of Aon and Willis Towers Watson. (DE 39 at 1.) At the time of his resignation, Landa and Aon had an employment agreement, which included a ninety (90) day restrictive covenant limiting Landa's ability to accept employment with any of Aon's competitors. (DE 38 at 4; DE 39 at 1.) As a result of the restrictive covenant, Landa's termination, as defined in the employment agreement, was not effective until September 8, 2021. (DE 39 at 1–2.) Landa maintains that he abided by his employment contract's restrictive covenant and did not start his new position working for one of Aon's competitor, Marsh USA, Inc. ("**Marsh**"), until after September 8, 2021. (DE 39 at 1.)

Following Landa's resignation, multiple Aon employees, including Aon's Managing Director for the East Region, the Sales Leader for the East Region, and Landa's son, Jason Landa, also resigned from Aon and subsequently joined Marsh. (DE 37 at 3; DE

47 at 1.) Moreover, in the following months, from June 2021 through January 2022, multiple Aon clients, including several of Plaintiff's largest revenue-generating clients, moved their accounts from Aon to Marsh. (DE 37 at 3.)  In light of these resignations, on June 24, 2021, Aon filed suit against Landa, Marsh, and other former Aon executives and employees in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida alleging Landa and the other former Aon employees breached numerous contract provisions, including the employee non-competition, non-solicitation, and confidentiality conditions. *See Aon Risk Servs., Inc. of Fla. et al. v. Marsh USA, Inc. et al.*, Case No. 2021-015086-CA-01 (44) (Fla. 11th Jud. Cir. Ct.) ("**Marsh Litigation**"). Following the adjudication of Aon's temporary restraining order, the parties to the Marsh Litigation entered into a settlement agreement which included a carve out for Plaintiff's EBP claim and benefits. (DE 37 at 5.)

According to the Plan's terms, Landa's EBP benefits were not scheduled to begin until October 1, 2021—the first month after his termination date. (DE 39 at 1–2.) Under the Plan, a member's benefits are conditioned on his compliance with certain post-employment restrictions, which include an employee non-solicit, a customer non-solicit and non-service, and a non-use and disclosure of confidential information. (DE 37 at 2.) Specifically, Section 4.4 of the Plan, the Forfeiture of Payments Under Certain Circumstances ("**Forfeiture Clause**") provides:

> A Member's right to receive any payments under the [Plan] shall be forfeited if he:
>
> (b) has, during or after employment, in the sole judgment of the Chief Executive Officer of the Company, after reasonable investigation, breached any of the following prohibitions:

>  (i) <u>Prohibition on Hiring</u> . . . an employee or former employee shall not . . . induce or cause any person or other entity to induce any person who is an employee of the Company to leave the employ of the Company;
>
>  (ii) <u>Prohibition on Completion</u> . . . an employee or former employee shall not . . . Compete in any way with the Business of the Company;
>
>  (A) 'Complete in any way with the Business of the Company' shall mean to enter or attempt to enter into (on one's own behalf or on behalf of any other person or entity) any business relationship of the same type or kind as the business relations which exists between the Company and its clients or customers to provide services related to the Business for any individual, partnership, company, association or other entity who or which was a client or customer of the Company in the 24 months prior to the end of employment or was a Prospective Client or Customer of the Company.
>
>  (B) 'Business' shall mean the businesses of insurance and reinsurance brokerage benefits consulting, compensation consulting, human resources consulting, managing underwriting, loss prevention, soliciting and servicing the insurance and reinsurance needs of commercial and individual clients . . .
>
>  (iii) <u>Prohibition on Disclosing Trade Secrets and Confidential Information</u>. An employee or former employee shall not disclose or use during (except as required in the course of employment with the Company) or subsequent to the termination of employment, any trade secrets or confidential or proprietary information of the Company of which the employee became aware by reason of being employed by the Company or to which the employee gained access during his employment by the Company and which has not been publicly disclosed (other than by the employee in breach of this provision) . . . Such information includes client and customer lists, data, records, computer programs, manuals, processes, methods and intangible rights which are either developed by the employee during the course of employment or to which the employee has access[.]

(DE 39 at 3–4.)

In the midst of the Marsh Litigation, Aon sent Landa an Excess Benefit Plan Payment Notice ("**Plan Payment Notice**") informing him that he would receive his EBP monthly benefit of $53,214.67 beginning October 1, 2021, payable in a five (5) year annuity, for a total payment amount of $3,192,880. (DE 39 at 2.) Included with the Plan Payment Notice were several administrative forms addressed to Landa's attention; Landa subsequently completed these forms and mailed them to the appropriate address on

November 2, 2021.  (DE 39 at 2.)  Soon after, Landa received a letter dated November 30, 2021, indefinitely suspending his EBP benefits effective immediately due to a "pending review of [his] potential violation(s) of the Plan's prohibitions on competitive activity (Section 4.4(b) of the Plan)" ("***Suspension Letter***"). (DE 39 at 2–3.)  The Suspension Letter did not deny Landa's EBP benefits.  But for more than ninety (90) days, Landa waited to receive further correspondence on the status of his EBP benefits until he submitted a letter to Defendant on March 4, 2022, demanding compensation for all current and past payments.[2] (DE 39 at 3.)  Landa received no response to his March 4, 2022 letter until April 29, 2022, when the Administrative Committee of the Aon Corporation Excess Benefit Plan ("***Committee***") sent Landa a formal denial of benefits ("***Forfeiture Letter***") informing him that Greg Case ("***Case***"), Aon's Chief Executive Officer, determined that Landa violated Sections 4.4(b)(i) – (iii) of the Plan and therefore forfeited his right to any EBP benefits.  (DE 37 at 5.)

---

[2] This action does not mark the first instance the Parties have appeared before a federal court in this District. On April 11, 2022, eighteen (18) days before the Plan sent Landa its formal denial of benefits, Plaintiff filed a civil complaint in this District in a case styled, *Landa v. Aon Corporation Excess Benefit Plan, as Amended and Restated as of January 1, 2009*, Case No. 22-cv-21091-BB ("***Landa I***"). (DE 39 at 3.) In Landa I, Plaintiff alleged that the Plan failed to formally deny his claim and he was entitled to payment of his benefits irrespective of the fact that he did not exhaust his administrative remedies. (DE 37 at 5.)  The federal court determined that Defendant failed to timely advise Plaintiff of its formal denial but dismissed Landa I without prejudice so that Plaintiff could exhaust the administrative process by filing an appeal to the Committee as provided under the Policy. (DE 39 at 5.)

On August 26, 2022, Landa appealed the initial benefit denial to the Committee pursuant to Section 6.3(c) of the Plan.[3] (DE 37-2 at D_0000451–53.[4]) Following a *de novo* review of the evidence, including Landa's submission of supplemental documents, the Committee issued its written final benefit denial ("**Benefit Denial**") on May 23, 2023, denying Landa's entitlement to EBP benefits due to his breach of Section 4.4(b) of the Plan. Within a month, on July 20, 2023, Plaintiff initiated this action asserting claims of improper denial of benefits under ERISA Section 502(a)(1)(B), codified at 29 U.S.C § 1132(a)(1)(B) ("**Count I**").[5]

## II. LEGAL STANDARD

### A. Summary Judgment

Outside of the ERISA context, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Typically, in evaluating a motion for summary judgment, the Court would consider the evidence in the record, "including depositions, documents,

---

[3] Section 6.3(c) sets forth that "[a] claimant (or the claimant's duly authorized representative) whose claim has been denied in whole or in party may appeal such denial to the Committee by making a written request for a review and may review pertinent documents and submit issues and comments in writing." (DE 37-2 at D_0000122.)

[4] The Administrative Record is filed under multiple docket entries. When citing to specific documents included in the Administrative Record, the Court will reference those documents according to the Bates stamped number printed at the bottom right corner of the page. *See* DE 37-2, 39-1, 39-2.

[5] ERISA Section 502 (a)(1)(B) sets forth an individual's right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *See* 29 U.S.C § 1132(a)(1)(B).

electronically stored information, affidavits, or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

However, in an ERISA benefits-denial case, the district court sits more as an appellate tribunal than as a trial court. *Curran v. Kemper Nat'l Servs., Inc.*, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (citations omitted). As such, the typical and ordinary summary judgment analysis does not apply in ERISA cases. *Ruple v. Hartford Life & Accident Ins. Co.*, 340 Fed. App'x 604, 610 (11th Cir. 2009). Instead of taking evidence, the district court evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary. *Id.* Although there "may indeed be unresolved factual issues evident in the administrative record, [] unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Pinto v. Aetna Life Ins. Co.*, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011); *Turner v. Am. Airlines, Inc.*, 2011 WL 1542078, at *4 (S.D. Fla. Apr. 21, 2011) ("[W]here, as here, 'the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'").

### B. ERISA Benefit Denial

Despite its comprehensive nature, the ERISA statute does not set forth the appropriate standard for actions pursuant to 29 U.S.C § 1132(a)(1)(B) challenging benefit eligibility determinations issued by plan administrators or fiduciaries. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Accordingly, the Supreme Court recognized three (3) distinct standards for reviewing an ERISA plan administrator's

decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion, and the administrator has a conflict of interest. *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195 (11th Cir. 2010). Following the Supreme Court's guidance, the Eleventh Circuit has developed the following multi-step framework for reviewing an ERISA plan administrator's benefits decisions that a court shall apply for benefits-denial claims:

> (1) Apply *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de* novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong," and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

## III. DISCUSSION

### A. Step One: Was the Committee's Benefits-Denial Decision Wrong?

First, the court ordinarily would review the administrator's decision de novo to determine whether the decision was "wrong." However, it is permissible to skip step one where, as here, the Plan gives the Committee "complete discretion as to whether a claim shall be allowed or denied." *Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan*, 832

Fed. App'x 586, 591 (11th Cir. 2020) (noting that on summary judgment, a court may assume the decision was *de* novo wrong in order to reach the discretion question) (citing *Doyle v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1352, 1357 (11th Cir. 2008)).

### B.  Step Two: Did the Committee Have Discretion?

Here, it is undisputed that the Plan vests the Committee with discretionary authority to determine benefit eligibility and to construe the terms of the Plan.  (DE 37 at 2; DE 39 at 4.)  In relevant part, Section 6.3(e) of the Plan provides that:

> The Committee shall have complete discretion as to whether a claim shall be allowed or denied. The Committee's decision in this regard shall be final and binding on all persons. Benefits under this Plan will be paid only if the Committee decides in its discretion that the applicant is entitled to them.

(DE 37-2 at D_0000123.)

### C.  Step Three: Was the Committee's Decision Arbitrary and Capricious?

The Court must now examine whether the administrator's denial of benefits was supported on reasonable grounds using the arbitrary and capricious standard of review.[6] *Blankenship*, 644 F.3d at 1355. Under the arbitrary and capricious standard, a court is limited to determine whether there was a reasonable basis for the administrator's decision, based upon the facts as known to the administrator at the time the decision was made. *Id.* at 1354; *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008).  Accordingly, when review is based on an arbitrary and capricious standard, the review will be limited to the administrative record. *Harris v. Lincoln Nat'l Life Ins. Co.*,

---

[6] In ERISA cases, the phrases "arbitrary and capricious" and "abuse of discretion" are used interchangeably. *See Blankenship*, at 1355 n.5.

42 F.4th 1292 (11th Cir. 2022). In line with 29 U.S.C § 1132(a)(1)(B), Plaintiff bears the burden of proving his entitlement to contractual benefits and shall demonstrate that the administrator's denial of benefits was arbitrary and capricious. *See Doyle*, 542 F.3d at 1360–62; *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). So long as the court can discern a reasonable factual basis, the Court shall uphold the administrator's determination, even if the record also contains contrary information. *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989).

To determine whether the administrator's denial was arbitrary and capricious, the Court begins with the language of the Plan itself. *See Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007). The Forfeiture Clause sets forth that "[a] member's right to receive any payments under the [Plan] shall be forfeited if he: . . . (b) has, during or after employment, in the sole judgment of the Chief Executive Officer of the Company, after reasonable investigation, breached any of the [specified] prohibitions."[7] (DE 37-2 at D_0000232–233.) After receiving the Suspension Letter and following the conclusion of the Marsh Litigation, Landa received Aon's Forfeiture Letter on April 29, 2022, explaining that Aon's CEO determined that Landa had violated Sections 4.4(b)(i)–(iii) and was not entitled to any payments under the terms of the Plan.[8] (DE 37-2 at D_0000401;

---

[7] It is undisputed that Landa participated in the Plan and was entitled to benefits following his departure from Aon and subject to the satisfaction of all material terms under the Plan. (DE 39 at 1; DE 49 at 1.)

[8] Plaintiff contends nothing in the Plan permits Defendant to indefinitely suspend benefits and that Defendant failed to timely provide a notice of denial of benefits within ninety (90) days after the Committee received Landa's claim as provided by the Policy. While the Court finds that that process leading up to Plaintiff's appeal of the forfeiture decision was less than straightforward, those issues were decided and ruled upon in *Landa.I.* (DE 37-2 at D_0000403–415.) The only issue before this Court is the Committee's Benefit Denial once Plaintiff exhausted all of his administrative remedies.

D_0000403–415; D_0000420–421)  Approximately four (4) months later, on August 26, 2022, Landa appealed this decision to the Committee, which holds "complete discretion as to whether a claim shall be allowed or denied."[9] (DE 37-2 at D_0000250; D_0000451–453)

Plaintiff generally argues that the Committee's denial decision was arbitrary and capricious because the Committee repeatedly disregarded his submitted evidence and aggrandized the weight of contrary evidence that supported the Committee's ultimate conclusion.  Landa's arguments, however, are belied by the administrative record, and the Court finds that the Committee's interpretation of the facts and application of Section 4.4(b) are reasonable.  A review of the Plan confirms that Section 4.4(b) clearly establishes three (3) separate prohibitions that if violated would result in the forfeiture of a member's EBP benefits. The Committee determined that there was sufficient proof, albeit partly through circumstantial evidence, to find Landa violated all three (3) prohibitions.

First, the Committee found that Landa violated the employee non-solicitation prohibition, Section 4.4.(b)(i), which provides that an employee or former employee shall not "induce or cause any person or other entity to induce any person who is an employee of the Company to leave the employ of the Company." (DE 37-2 at D_0000430; DE 39-2 at D_0000813.)  Plaintiff claims the Committee's decision on the employee non-solicitation prohibition was unreasonable because the evidence it relied on cannot be

---

[9] Plaintiff filed his appeal of the forfeiture decision past the sixty (60) days allotted by the Plan's terms. Plaintiff initially resisted signing a tolling agreement at the time when *Landa I* was still pending but ultimately Defendant allowed Plaintiff to file his appeal out of time. (DE 37 at 5–6.)

interpreted to prove Landa induced other Aon employees to leave the Company and join Aon's competitor. Additionally, Landa argues the Committee did not apply the appropriate weight to his evidence that rebutted the proposition that he induced or caused other employees to leave Aon.

Based on the record, there is no indication that the Committee did not consider or failed to apply the appropriate weight to Plaintiff's evidence, which included Landa's sworn statements. In the Benefit Denial, the Committee highlights the evidence material to the non-solicitation prohibition, including Landa's evidence and arguments asserted in his defense. In its rationale, the Committee mentions Plaintiff's sworn statement and explains how Landa's statement does not outweigh its findings, supported through circumstantial evidence, that Landa induced other senior employees to leave the Company. The Committee presents its conclusion in a reasonable manner and cites to the undisputed fact that Landa met with a group of senior employees for a dinner on May 19, 2021, where Landa discussed being interested in an offer Marsh made to him. The Committee points out that three (3) of the four (4) senior employees who attended that dinner all left Aon for Marsh within a few weeks after the dinner and at or around the same time Landa submitted his resignation. As such, Plaintiff did not sufficiently carry its burden in demonstrating that the Committee did not have a reasonable basis to conclude he violated Section 4.4.(b)(i).

Second, the Committee concluded that Landa violated Section 4.4(b)(ii), the non-competition prohibition, with respect to the transfer of Aon's clients' business to Marsh in 2021. (DE 39-2 at D_0000811–813.) Section 4.4(b)(ii) establishes that an employee or former employee shall not "[c]ompete in any way with the Business of the Company,"

which is defined to mean "to enter into or attempt to enter into (on one's own behalf or on behalf of any other person or entity) any business relationship of the same type or kind as the business relationship which exists between the Company and its clients or customers to provide services related to the Business." (DE 37-2 at D_0000430–431.) Plaintiff maintains that the Committee made the "enormous and unsupported logical leap" in the face of contradictory evidence he submitted to baselessly conclude that he solicited or serviced former Aon clients—Fontainebleau, PMC, and Lennar—in violation of the non-competition prohibition.  Again, Plaintiff failed to carry his burden to demonstrate that the Committee's decision on the issue was arbitrary and capricious.  In the Committee's longest rationale, the Committee explains that there was sufficient evidence to find Landa did not adhere to the non-competition prohibition. The Committee credits the temporal proximity of the Fontainebleau's, one of Landa's largest revenue-generating clients, broker of record change ("**BOR**") from Aon to Marsh less than one (1) week after Landa's resignation.  Then, in a span of four (4) months, two additional clients, PMC and Lennar, moved its insurance brokerage business from Aon to Marsh.  In the record, the Committee explains Landa does not deny that Aon's records reflect that he was the originator of these client's dealings with Aon and that he had an extensive business relationship with all three (3) clients during his tenure at Aon. Accordingly, the Court finds that the Committee considered all the evidence Landa submitted on his behalf and all other facts on the Administrative Record to reasonably concluded that Landa violated Section 4.4(b)(ii).

Lastly, the Committee determined that Landa violated Section 4.4(b)(iii)'s prohibition on the use and disclosure of Aon's confidential information by sharing his and

his son's book information on Aon clients.  (DE 39-2 at D_0000814.)  Section 4.4.(b)(iii) states that an employee or former employee "shall not disclose or use during (except as required in the course of employment with the Company) . . . any trade secrets or confidential or proprietary information of the Company." (DE 37-2 at D_0000431.)  Based on the Administrative Record, the Committee relies on two (2) separate emails to support its conclusion.  The first email was an email Landa sent from his Aon account to his personal email account which included confidential Aon records containing client account and revenue information.  The second email was an email Landa's son, Jason Landa, sent from his personal email account to Landa's personal email account featuring Jason Landa's client accounts and revenue information.  Here, Plaintiff maintains that the two (2) emails do not amount to a violation of the use or disclosure of confidential information prohibition as it was common practice for him to utilize his personal email account.  Again, however, in light of the temporal proximity of Jason Landa's email sent on June 8, 2021, and Landa's resignation on June 10, 2021, the Committee inferred that Landa was in a position to share client revenue information with Marsh in an attempt to formulate offers and target Aon clients for solicitation.  Separately, Plaintiff continues to argue that the Committee ignored evidence in reaching its conclusion.  But there is still no definitive showing of such an omission as the Committee discusses evidence favorable to Landa's position in its rationale.  Accordingly, based on the record, there is no showing that the

Committee did not have a reasonable basis to conclude that Landa violated Section 4.4(b)(iii).

### D. Step Four to Six: The Committee's Conflict of Interest

Given that the Court has determined there is a reasonable basis to support the Committee's denial of benefits decision, now the Court must determine if the Committee operated under a conflict of interest. *Blankenship*, 644 F.3d at 1355. Plaintiff argues that Defendant had a conflict of interest because it both administers and pays claims under the Plan with no safeguards against personal motives. In response, Defendant asserts that while Aon is responsible for the payment of benefits, the Committee itself has no financial interest in the outcome of a single claim.

In the Eleventh Circuit, a conflict of interest is "merely [] a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* Moreover, at this stage of the analysis, "the burden remains on the plaintiff to show the decision was arbitrary [as] it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* Here, even in the light most favorable to Plaintiff, the Court cannot find a conflict of interest. Besides conclusory statements and unsubstantiated accusations, Plaintiff has not sufficiently proved that a conflict of interest was present. The Administrative Record is clear that the Committee relied on evidence, albeit circumstantial, to support its conclusions and considered rebuttal evidence which it provided reasonable grounds for not finding persuasive. Because a conflict of interest is merely a factor and Plaintiff has not sufficiently carried its burden in demonstrating proof of the Committee's purported conflict, the Court finds that although the Committee may have structural conflict, the Court still concludes that the Defendant reasonably denied

Plaintiff's benefits under the Plan. *Wright v. Reliance Standard Life Ins. Co.*, 844 Fed. App'x 141, 145 (11th Cir. 2021) ("[T]he presence of a structural conflict of interest is an unremarkable fact in today's marketplace.").

## IV.  CONCLUSION

Accordingly, having carefully reviewed the Parties' Motions for Summary Judgment, the record, and for the reasons stated above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Aon Corporation Excess Benefit Plan's Motion for Summary Judgment (DE 36) is **GRANTED**.

2. Plaintiff Michael Landa's Motion for Summary Judgment (DE 38) is **DENIED**.

3. Final judgment will follow by way of a separate order.

4. All deadlines and hearings are **CANCELED**. All pending motions are **DENIED AS MOOT**.

5. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 30th day of September, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE